UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAUN L. MURPHY,<br>  Plaintiff<br><br>v.<br><br>PAUL REILLY CO. ILLINOIS, INC. and<br>MICHAEL FITZGERALD,<br>  Defendants | Case No.<br><br>Judge:<br><br>Magistrate Judge:<br><br>JURY DEMANDED |

## COMPLAINT AT LAW

  Plaintiff SHAUN LIAM MURPHY, by and through his attorneys, Denise M. DeBelle and Karen J. Doran, in his Complaint against Defendants Paul Reilly Co. Illinois, Inc. and Michael Fitzgerald alleges and states as follows:

### NATURE OF ACTION

  1. This complaint is brought to recover damages proximately caused by Defendant Paul Reilly Co. Illinois, Inc. ("PRC") for illegal discrimination and failure to accommodate in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the Illinois Human Rights Act, 775 ILCS 5/2-101 *et seq.* ("IHRA"); Defendant PRC's illegal retaliatory termination of Plaintiff Shaun Liam Murphy's ("Murphy") employment in violation of the Illinois Workers' Compensation Act, 820 ILCS 305/1 *et seq.* ("IWCA"); and Defendant PRC and Defendant Michael Fitzgerald's ("Fitzgerald") illegal interference with Plaintiff's use of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA"), and retaliation for taking FMLA-protected leave.

### JURISDICTION AND VENUE

  2. Court has original jurisdiction over Plaintiff's ADA and FMLA claims under 28

1

U.S.C. §§ 1331, 1337, and 1343. Declaratory, injunctive and equitable relief are sought pursuant to 29 U.S.C. §2617 (a)(2). The court's pendent jurisdiction is invoked over any and all state law claims brought as a part of this action.

3. The Court has supplemental jurisdiction over Plaintiff's IHRA claims and her state law retaliatory discharge claim pursuant to 28 U.S.C. § 1367(a).

4. Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendants' illegal acts complained of herein took place within the geographical boundaries of this Court's jurisdiction.

5. On November 2, 2020, Murphy timely filed a charge of discrimination alleging disability discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the Illinois Department of Human Rights ("IDHR"). That Charge is attached as Exhibit A.

6. On May 13, 2021, Plaintiff received from the EEOC a Notice of Right to Sue for that charge, a copy of which is attached as Exhibit B.

7. On June 16, 2021, Plaintiff received from the IDHR a Notice of Right to Sue for that charge, a copy of which is attached as Exhibit C.

8. Murphy filed his Complaint within ninety (90) days of receipt of these Notices of Right to Sue.

**PARTIES**

9. The Plaintiff is Shaun Liam Murphy, a citizen of the United States domiciled in the State of Illinois.

10. Defendant Paul Reilly Company Illinois, Inc. is an Illinois corporation with its principal place of business at 1967 Quincy Court, Glendale Heights, Illinois.

11. Upon information and belief, at all relevant times, PRC employed was an employer as defined by the Family and Medical Leave Act.

12. Defendant Michael Fitzgerald is a citizen of the United States domiciled in the 1967 Quincy Court, Glendale Heights, State of Illinois.

13. Fitzgerald, at all relevant times, has been the President and CEO of PRC, acting in its interest.

## FACTS COMMON TO ALL COUNTS

14. Shaun Murphy began work at PRC on October 2, 2017 as a Service Technician.

15. Murphy's job was to install and perform maintenance work on industrial garage doors, which included troubleshooting mechanical, hydraulic, and electronic issues in order to repair the doors.

16. On August 17, 2018, Murphy injured his right knee at work while welding a truck dock bumper.

17. Murphy did not violate any of PRC's safety policies or procedures when he was injured on the job.

18. Murphy was treated by Stephen Arndt, M.D. on the day of the injury.

19. On August 18, 2018 Murphy filed a Workers' Compensation claim for that injury and PRC's insurance carrier paid his medical expenses and wages while he was on leave for the injury.

20. On October 2, 2018 Murphy became eligible for FMLA-protected leave.

21. PRC did not inform Murphy of his FMLA eligibility nor did it designate any part of his leave as FMLA-protected.

22. On October 30, 2018 PRC began drafting Murphy's 2018 performance review.

23. PRC had a 100% healed policy in place – that is, PRC would not allow Murphy to return to work with restrictions.

24. On November 25, 2018 Murphy returned to work without restrictions.

25. Upon information and belief, on December 3, 2018 Defendant Fitzgerald emailed Murphy's supervisor Harry Girip ("Girip") Murphy's partially drafted evaluation to complete.

26. On December 11, 2018 Fitzgerald and Girip finalized Murphy's performance evaluations for 2018.

27. In that performance evaluation PRC gave Murphy a rating of 1.0 out of 5.0 under "Follows safety policies and procedures," and explicitly identified the fact that he was "Hurt: 8/20/18-11/16/18."

28. Murphy received an overall rating of 4.5 out of 5.0 (or 89.5), meaning that he was meeting his employer's legitimate expectations.

29. In or around December 2018 Girip told Murphy that PRC does not have light duty and that its employees must "be 100%" when they return to work from a medical leave of absence.

30. Murphy was diagnosed with chronic obstructive pulmonary disease ("COPD") sometime during the summer of 2018.

31. He has also suffered from asthma and severe allergies since childhood.

32. Murphy was off work from June 17, 2019 through June 25, 2019 because of his serious pulmonary condition.

33. He provided PRC with notes from his treating physician, Mithila Janakiram, M.D., who explained that he was off work "due to illness/doctor appointment."

34. Although PRC did not inform Murphy that he was FMLA-eligible, nor did it

4

designate that period of leave as FMLA protected, the leave was nevertheless protected under the FMLA.

35. On November 11, 2019, while at work Murphy suffered a severe recurrence injury to his right knee.

36. That day he cooperated with PRC's policy and he also saw Dr. Arndt.

37. On or around November 14, 2019, Murphy's attorney filed a claim for Murphy's work-related injuries with the Illinois Worker's Compensation Commission.

38. Murphy was next treated by orthopedic surgeon Kevin Walsh, M.D. ("Dr. Walsh") on November 18, 2019.

39. Dr. Walsh took Murphy off work through mid-December at which point he ordered an MRI.

40. In compliance with PRC policy, on November 19, 2019, Murphy submitted a second Workers' Compensation claim to Girup.

41. On this form, Murphy explained that he had suffered a recurring work-related injury relating to the original on-the-job injury that he had suffered on August 17, 2018.

42. Murphy made a second claim for Workers' Compensation for this second injury.

43. Because of his injury, Murphy experienced severe pain, which impaired his ability to, *inter alia*, stand, walk, run, jump, squat, bend, lift, climb, carry, work, and sleep.

44. These physical limitations lasted for months, and even as late as October 2020 Murphy still could not run, jump, or kneel.

45. In or around November 2019, Girup informed Murphy that if he "couldn't come back 100%, [he] couldn't come back to work. There is no light duty."

46. Murphy understood Girup's statement to reiterate PRC's policy that its employees

must be "100% healed' – that is, have no restrictions – before they could return to work.

47. On November 27, 2019 Dr. Walsh extended Murphy's medical leave of absence from work.

48. On December 3, 2019, Fitzgerald provided Girip with a copy of a partially completed performance evaluation for Murphy, directing him to complete it.

49. PRC gave Murphy a score of 1.0 out of 4.5 for "Attendance" on this draft evaluation, citing his 6/17/19 through 6/25/19 absences.

50. On January 15, 2020, PRC's Human Resources Manager Mary Jones ("Jones"), informed Murphy that he could not apply for short-term disability because he had suffered an on-the-job injury.

51. In or around January 2020, Murphy discovered that PRC had denied his Workers' Compensation claim and has refused to voluntarily pay benefits under the IWCA.

52. On January 22, 2020, Jones confirmed through email to Murphy that his "claim was being denied."

53. Murphy's Workers' Compensation claim against PRC is still pending.

54. Dr. Walsh's diagnosis of Murphy's knee condition was stated as follows: "partial medical and lateral miniscectomies with MRI evidence of a 6 mm area of chondral loss involving the posterior corner of the lateral tibial plateau with adjacent bone marrow edema representing grade 4 changes."

55. After each medical appointment, Murphy contacted Girup and provided him with a status of his health condition.

56. Murphy underwent total right knee replacement surgery on January 10, 2020.

57. On January 15, 2020 Murphy informed Jones that he had knee replacement

6

surgery and would "be out for a substantial time."

58. On February 4, 2020, Murphy sent an email message to Jones informing her that he was about to begin five weeks of physical therapy and that on March 9 he would be reevaluated for his ability to return to work.

59. Jones immediately responded to Murphy, stating "all we will need from you is a return to work authorization with no restrictions."

60. PRC never asked Murphy whether he needed a reasonable accommodation.

61. Two weeks later, Fitzgerald fired Murphy via letter dated February 18, 2020, alleging "Your services are no longer required due to poor performance."

62. Murphy received the letter on February 26, 2020.

63. There was no indication given to Murphy in the termination letter or at any time what specific performance problems had led to the termination.

64. Apart from this letter of termination, Murphy had never received from Fitzgerald or any other manager at PRC a written notice of any discipline; rule, policy, or procedure violation; or any performance problem.

65. Prior to February 2020, Defendants had not concluded that Murphy's job performance was unsatisfactory.

66. The day after receiving the termination letter, on February 27, 2020, Murphy sent a letter to Mr. Fitzgerald asking for "some clarification on my poor performance. If you could forward a response and any documentation at your earliest convenience, I would greatly appreciate it."

67. Defendants never replied to Murphy's request.

68. On March 9, 2020, Dr. Walsh released Murphy to return to work and Dr. Walsh

did not identify any restrictions.

69. In an effort to save his job, that same day Murphy texted Girip his return-to-work note from Dr. Walsh, but he never heard back from anyone at PRC.

70. Murphy would have been able to resume performing the essential functions of his job as Service Technician on March 9, 2020.

71. Though Murphy received medical treatment for his second knee injury, his pain and symptoms persist.

## COUNT I: UNLAWFUL TERMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AGAINST DEFENDANT PRC

72. Plaintiff reaffirms, realleges, and restates Paragraphs 1 through 71 above, and incorporates them into this Count I of his Complaint as if fully stated herein.

73. At all relevant times, Murphy was a person with a disability as defined under the ADA.

74. At all relevant times, Murphy had a record of being a person with a disability as defined under the ADA.

75. At all relevant times, PRC regarded Murphy as being a person with a disability as defined under the ADA.

76. Before it fired Murphy, PRC knew that Murphy suffered from a severe knee injury that restricted him for months and required surgery and ongoing physical therapy.

77. PRC also knew that Murphy needed it to extend his medical leave until March 9, 2020 as a reasonable accommodation, at which time he would be evaluated by Dr. Walsh in order to return to work.

78. PRC terminated Murphy's employment because he was a person with a disability.

8

79. At the time he was terminated, Murphy was qualified to perform the essential functions of his job with a reasonable accommodation.

80. Moreover, Murphy's performance of his job met or exceeded PRC's legitimate expectations.

81. Murphy's termination was unlawful discrimination in violation of the ADA.

82. As a direct and proximate result of PRC's illegal conduct as described above, Murphy has lost, and is expected to continue to lose, income in the form of wages; bonuses; prospective retirement, social security, and other benefits in a sum to be proven at trial, and has suffered emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

83. PRC knew that its acts as described above were prohibited by the ADA or acted with reckless disregard to that possibility. PRC should therefore be subject to punitive damages as an example to deter other employers from engaging in conduct of this kind.

## COUNT II: FAILURE TO ACCOMMODATE IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AGAINST DEFENDANT PRC

84. Plaintiff reaffirms, realleges, and restates Paragraphs 1 through 71 above, and incorporates them into this Count II of his Complaint as if fully stated herein.

85. At all relevant times, Murphy was a person with a disability as defined under the ADA.

86. Before it fired Murphy, PRC knew that Murphy suffered from a severe knee injury that restricted him for months and required surgery and ongoing physical therapy.

87. PRC reasonably accommodated Murphy's disability by allowing him to take time off from work to undergo surgery and recuperate.

88. PRC knew that Murphy needed the company to continue to reasonably

accommodate his disability by extending his medical leave until March 9, 2020 when he would be evaluated for his return to work.

89. PRC, without undue hardship, could have allowed Murphy to return to work on March 9, 2020.

90. PRC refused to allow Murphy to return to work unless he had no restrictions.

91. PRC enforced a blanket policy for its Service Technicians that they must obtain a full medical release with no restrictions before they could return to work from a medical-related absence.

92. Such a policy is a *per se* violation of the Americans with Disabilities Act.

93. PRC never initiated or otherwise engaged with Murphy in the ADA's interactive process to identify a reasonable accommodation for Murphy's disability.

94. PRC terminated Murphy's job 19 days before Dr. Walsh released Murphy to return to work.

95. PRC failed to reasonably accommodate Murphy's disability in violation of the ADA.

96. As a direct and proximate result of PRC's illegal conduct as described above, Murphy has lost, and is expected to continue to lose, income in the form of wages; bonuses; prospective retirement, social security, and other benefits in a sum to be proven at trial, and has suffered emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

97. PRC knew that its acts as described above were prohibited by the ADA or acted with reckless disregard to that possibility. PRC should therefore be subject to punitive damages as an example to deter other employers from engaging in conduct of this kind.

## COUNT III: UNLAWFUL TERMINATION IN VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT AGAINST DEFENDANT PRC

98. Plaintiff reaffirms, realleges, and restates Paragraphs 1 through 71 above, and incorporates them into this Count III of his Complaint as if fully stated herein.

99. At all relevant times, Murphy was a person with a disability as defined under the IHRA.

100. At all relevant times, Murphy had a record of being a person with a disability as defined under the IHRA.

101. At all relevant times, PRC regarded Murphy as being a person with a disability as defined under the IHRA.

102. Before it fired Murphy, PRC knew that Murphy suffered from a severe knee injury that restricted him for months and required surgery and ongoing physical therapy.

103. PRC also knew that Murphy needed it to extend his medical leave until March 9, 2020 as a reasonable accommodation, at which time he would be evaluated by Dr. Walsh in order to return to work.

104. PRC terminated Murphy's employment because he was a person with a disability.

105. At the time he was terminated, Murphy was qualified to perform the essential functions of his job with a reasonable accommodation.

106. Moreover, Murphy's performance of his job met or exceeded PRC's legitimate expectations.

107. Murphy's termination was unlawful discrimination in violation of the IHRA.

108. As a direct and proximate result of PRC's illegal conduct as described above, Murphy has lost, and is expected to continue to lose, income in the form of wages; bonuses; prospective retirement, social security, and other benefits in a sum to be proven at trial, and has

suffered emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

109. PRC knew that its acts as described above were prohibited by the IHRA or acted with reckless disregard to that possibility. PRC should therefore be subject to punitive damages as an example to deter other employers from engaging in conduct of this kind.

### COUNT IV: FAILURE TO ACCOMMODATE IN VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT AGAINST DEFENDANT PRC

110. Plaintiff reaffirms, realleges, and restates Paragraphs 1 through 71 above, and incorporates them into this Count IV of his Complaint as if fully stated herein.

111. At all relevant times, Murphy was a person with a disability as defined under the IHRA.

112. Before it fired Murphy, PRC knew that Murphy suffered from a severe knee injury that restricted him for months and required surgery and ongoing physical therapy.

113. PRC reasonably accommodated Murphy's disability by allowing him to take time off from work to undergo surgery and recuperate.

114. PRC knew that Murphy needed the company to continue to reasonably accommodate his disability by extending his medical leave until March 9, 2020 when he would be evaluated for his return to work.

115. PRC, without undue hardship, could have allowed Murphy to return to work on March 9, 2020.

116. PRC refused to allow Murphy to return to work unless he had no restrictions.

117. PRC enforced a blanket policy for its Service Technicians that they must obtain a full medical release with no restrictions before they could return to work from a medical-related absence.

118. Such a policy is a *per se* violation of the Americans with Disabilities Act.

119. PRC never initiated or otherwise engaged with Murphy in the ADA's interactive process to identify a reasonable accommodation for Murphy's disability.

120. PRC terminated Murphy's job 19 days before Dr. Walsh released Murphy to return to work.

121. PRC failed to reasonably accommodate Murphy's disability in violation of the IHRA.

122. As a direct and proximate result of PRC's illegal conduct as described above, Murphy has lost, and is expected to continue to lose, income in the form of wages; bonuses; prospective retirement, social security, and other benefits in a sum to be proven at trial, and has suffered emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

123. PRC knew that its acts as described above were prohibited by the IHRA or acted with reckless disregard to that possibility. PRC should therefore be subject to punitive damages as an example to deter other employers from engaging in conduct of this kind.

### COUNT V: RETALIATORY DISCHARGE IN VIOLATION OF ILLINOIS COMMON LAW AGAINST DEFENDANT PRC

124. Plaintiff reaffirms, realleges, and restates Paragraphs 1 through 71 above, and incorporates them into this Count V of his Complaint as if fully stated herein.

125. PRC was aware in November 2019 that Murphy had filed two Workers' Compensation claims against the company for injuries related to his right knee.

126. At all relevant times the Illinois common law and the IWCA prohibited PRC from terminating Murphy's employment for filing Workers' Compensation claims against PRC and seeking medical treatment in connection with his workplace injuries as detailed above.

13

127. As described above, PRC terminated Murphy because of his IWCA-protected activities.

128. PRC's termination of Murphy was an illegal retaliatory discharge in violation of the IWCA and Illinois common law.

129. As a direct and proximate result of PRC's illegal conduct as described above, Murphy has lost, and is expected to continue to lose, income in the form of wages; bonuses; prospective retirement, social security, and other benefits in a sum to be proven at trial, and has suffered emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, and he is expected to incur future damages.

130. The above-described conduct by PRC was willful and wanton and done with reckless disregard and indifference to Illinois common law and the IWCA and to Murphy's rights thereunder. PRC should therefore be subject to punitive damages as an example to deter others from engaging in conduct of this kind.

### COUNT VI: UNLAWFUL INTERFERENCE IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT AGAINST DEFENDANT PRC

131. Murphy reaffirms, realleges and restates Paragraphs 1 through 71 above, and incorporates them into this Count VI of his Complaint as if fully stated herein.

132. Murphy was eligible for FMLA-protected leave beginning on October 2, 2018 in that, at the time that he required leave, he had been employed by PRC for at least 12 months and worked at least 1,250 hours in the prior 12 months.

133. At all relevant times hereto, PRC was a covered employer under the FMLA in that it employed at least 50 employees within 75-mile radius of Murphy's workplace.

134. At all relevant times, Murphy was qualified for his position as a Service Technician and his performance met or exceeded his employer's legitimate expectations.

135. PRC had the ability to control in whole or in part whether it would interfere with Murphy's rights under the FMLA.

136. PRC had the ability to control in whole or in part whether FMLA-qualifying medical leave would be used as a negative factor in Murphy's performance evaluations.

137. By lowering Murphy's performance rating because he took FMLA-qualifying medical leaves of absence, PRC violated the FMLA by discouraging Murphy from taking FMLA-qualifying leave.

138. As a result of these violations, Plaintiff has lost wages, his employment, and has suffered other damages.

139. Defendant engaged in willful disregard of Plaintiff's rights under the FMLA and therefore had no reasonable grounds for believing that the acts described above were in accordance with the FMLA, Defendant's violations were not in good faith, thereby warranting liquidated damages, including interest.

### **COUNT VII: UNLAWFUL INTERFERENCE IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT AGAINST DEFENDANT FITZGERALD**

140. Murphy reaffirms, realleges and restates Paragraphs 1 through 71 above, and incorporates them into this Count VII of his Complaint as if fully stated herein.

141. Murphy was eligible for FMLA-protected leave beginning on October 2, 2018 in that, at the time that he required leave, he had been employed by PRC for at least 12 months and worked at least 1,250 hours in the prior 12 months.

142. At all relevant times hereto, Fitzgerald was a person who acted, directly or indirectly, in the interest of PRC to Murphy.

143. At all relevant times, Murphy was qualified for his position as a Service Technician and his performance met or exceeded Fitzgerald's legitimate expectations.

144. Fitzgerald had the ability to control in whole or in part whether he would interfere with Murphy's rights under the FMLA.

145. Fitzgerald had the ability to control in whole or in part whether FMLA-qualifying medical leave would be used as a negative factor in Murphy's performance evaluations.

146. By lowering Murphy's performance rating because he took FMLA-qualifying medical leaves of absence, Fitzgerald violated the FMLA by discouraging Murphy from taking FMLA-qualifying leave.

147. As a result of these violations, Plaintiff has lost wages, his employment, and has suffered other damages.

148. Defendant Fitzgerald engaged in willful disregard of Plaintiff's rights under the FMLA and therefore had no reasonable grounds for believing that the acts described above were in accordance with the FMLA, Defendant Fitzgerald's violations were not in good faith, thereby warranting liquidated damages, including interest.

**WHEREFORE**, Plaintiff respectfully prays for judgment in his favor and against Defendants and seeks the following relief:

**Against Defendant PRC:**

a. lost wages and benefits in an amount to be proven at trial;

b. compensatory damages in an amount to be proven at trial;

c. reinstatement and/or front pay and benefits in an amount to be proven at trial;

d. liquidated damages in an amount to be proven at trial;

e. punitive damages in an amount to be proven at trial;

f. attorneys' fees and costs;

g. all available interest;

    h.  offset of tax liability; and

    i.  any other relief the Court may deem just and equitable.

**Against Defendant Fitzgerald:**

    a.  lost wages and benefits in an amount to be proven at trial;

    b.  reinstatement and/or front pay and benefits in an amount to be proven at trial;

    c.  liquidated damages in an amount to be proven at trial;

    d.  attorneys' fees and costs;

    e.  all available interest;

    f.  offset of tax liability; and

    g.  any other relief the Court may deem just and equitable.

    Respectfully submitted,

    By: /s/ Karen J. Doran
    One of Plaintiff's attorneys

Karen J. Doran
2100 Manchester Road, Suite 1612
Wheaton, IL 60187
630-384-9367 (p)
Email: karen@karendoranlaw.com
ARDC No. 6282773

Denise M. DeBelle
Law Office of Denise M. DeBelle
5555 N. Sheridan Road, Suite 4
Chicago, Illinois 60640
773-728-0136 (p)
Email: denise@debelle-law.com
ARDC No. 6202998

**Plaintiff demands trial by jury.**